UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
                                         :
TENOR OPPORTUNITY MASTER FUND, LTD,      :
ARIA OPPORTUNITY FUND, LTD., & PARSOON   :
OPPORTUNITY FUND, LTD.,,                 :     11 Civ. 06067 (KBF)
                                         :
                     Tenor,              :     MEMORANDUM OPINION &
                                         :            ORDER
         -v-                             :
                                         :
OXYGEN BIOTHERAPEUTICS, INC.,            :
                                         :
                     Defendant.          :
                                         :
------------------------------------- X

KATHERINE B. FORREST, District Judge:

        This is a straightforward breach of contract action.  In

May 2010, plaintiffs Tenor Opportunity Master Fund, Ltd., Aria

Opportunity Fund, Ltd., and Parsoon Opportunity Fund, Ltd.

(collectively, "Tenor") entered in a subscription agreement with

defendant Oxygen Biotherapeutics, Inc. ("Oxygen"), pursuant to

which Tenor acquired equity and warrants as well as certain

additional contractual rights relating to future offerings (the

"Agreement").  Specifically, paragraph 16 of Annex I to the

Agreement contained terms for "Participation in Future

Offerings."

        On July 1, 2011, Oxygen consummated an offering for $4.6

million of debt securities to a third party.  Tenor claims that

in so doing, Oxygen failed to comply with its contractual

obligations to provide Tenor with what was essentially a right of first refusal and that Tenor was thus damaged thereby.

Plaintiffs filed this action on August 30, 2011.  After a period of document and deposition discovery, both parties have now moved for summary judgment.  Tenor has moved for partial summary judgment as to liability on their breach of contract claim; Oxygen has moved for summary judgment as to damages (e.g., that even if there was a breach, Tenor cannot prove--or even raise a triable issue of fact as to--any damages suffered).

For the reasons set forth below, this Court GRANTS Tenor's motion for summary judgment and DENIES defendant's.

I.    FACTUAL BACKGROUND[1]

On May 4, 2010, Tenor and Oxygen entered into the Agreement pursuant to which Tenor provided defendant with $2.5 million in financing in exchange for 301,724 shares of stock and 128,233 warrants.  (Local Rule 56.1 Stmt. of Undisputed Facts by Pls. ("Pls. 56.1") (Dkt. No. 37) ¶ 3.)  The terms of the financing were set forth in the Agreement.  (Id.)  The parties do not dispute that Tenor fully performed its obligations under the Subscription Agreement.  (Id.)

Appended to the Agreement is Annex I, which contains certain provisions relating to Tenor's participation in future financings.  (Decl. of David Dunn ("Dunn Decl.") (Dkt. No. 38)

---

[1] The following facts are undisputed unless otherwise stated.

Ex. A (OBT 0206-000000141).)   Section 16.2 provides that from the date of the Agreement in May 2010 until November 2011, Oxygen agreed that it would not

> directly or indirectly, offer, sell, grant any option to purchase, or otherwise dispose of (or announce any offer, sale, grant or any option to purchase or other disposition of) any of its or its subsidiaries' equities or equity equivalent securities, including without limitation any debt, preferred stock or other instrument or security that is, at any time during its life and under any circumstances convertible into or exchangeable or exercisable for Common Stock or Common Stock Equivalents . . . unless the Company shall have first complied with this Section 16 . . .

(Id. (emphasis added); Pls. 56.1 ¶ 6.)

Section 16 of the Agreement sets forth the following requirements for Oxygen with respect to Tenor's "right of first refusal":

> 1.   Oxygen was to deliver to Tenor a written notice stating that Oxygen may have information to share with Tenor and requesting that Tenor inform Oxygen if it was willing to receive notice of such information.
>
> 2.   If Tenor indicated that it was willing to receive such information, then Oxygen was required to "promptly deliver," but in any event no later than one business day after being informed by Tenor of their willingness to receive, the information a written notice (the "Offer Notice")[2] of any proposed or intended issuance or sale or exchange (the "Offer") of the securities being offered (the "Offered Securities") in a Subsequent Placement.

---

[2] Section 16 provides that the Offer Notice will contain certain information including (i) the identity and description of the Offered Securities to be issued, sold or exchanged, and (ii) the identity of the persons or entities (if known) to which or with which the Offered Securities are to be offered, issued, sold or exchanged.

3.   Oxygen must also offer to issue and sell to or exchange with Tenor fifty percent (50%) of the Offered Securities, allocated among all of the investors in the Offering.

4.   Section 16(b) provides that Tenor would then have 24 hours after receipt of the Offer Notice (the "Offer Period") in which it can set forth the amount that it elect to purchase; if within that 24-hour period Oxygen changes the terms of the offer, it could deliver to Tenor a new Offer Notice and the Offer Period then runs for an additional 10 days after receipt.

5.   Section 16(c) provides that after the expiration of the Offer Period, Oxygen could then publicly announce and consummate the transaction with any portion of the offer that neither Tenor nor another investor elected to accept, but then only on the terms and conditions that are not more favorable to the third party(ies) than those contained in the Offer Notice.

(Dunn Decl. Ex. A at OBT 0206-000000142-43; see also Pls. 56.1 ¶¶ 7-9.)

It is undisputed that by early 2011, Tenor had sold its shares in Oxygen but retained its warrants. (Dep. of David Kay ("Kay Dep.") at 54, 64 (Decl. of Sarah Y. Khurana ("Khurana Decl.") (Dkt. No. 30) Ex. A); see also Dep. of Waqas Khatri ("Khatri Dep.") at 107 (Khurana Decl. Ex. B).) It is also undisputed that in March 2011, Tenor sent Oxygen an unsolicited proposal for Tenor to provide additional capital to Oxygen in an amount of up to $3 million. (Pls. 56.1 ¶ 12.) Oxygen did not respond to the proposal in the March time frame. (Id. ¶ 14.)

In May 2011, Oxygen engaged FGP Capital ("FGP") as a placement agent to seek funding for Oxygen. (Pls. 56.1 ¶ 15.)

Oxygen also engaged William Blair & Co. ("Blair") to solicit interest in Oxygen. (Id. ¶ 16.)

On or about June 9, 2011, Blair contacted Tenor and asked whether Tenor was willing to receive information regarding a "proposed issuance" for financing from Oxygen. (Pls. 56.1 ¶ 17; Def.'s Resp. to Pls.' 56.1 ("Def. 56.1 Resp.") (Dkt. No. 55) ¶ 17.) Tenor agreed. (Pls. 56.1 ¶ 18; Def. 56.1 Resp. ¶ 17.) Blair then provided Tenor with a document entitled "Oxygen Biotherapeutics: Employing 02, Preserving Life." (See Decl. of Waqas Khatri ("Khatri Decl.") (Dkt. No. 39) Ex. E.) That document contained a prominent "Legal Disclaimer" on page 1 which states, in part, "This Presentation contains forward looking statements . . . . This presentation is not an offer or a solicitation of an offer to buy any securities in the Company." (Id. at OBT 0206-000000291 (referred to herein as the "Blair presentation").)

Tenor and Oxygen spoke on June 10, 2011. (See Pls. 56.1 ¶ 20.) Following that call, Waqas Khatri, an investment analyst with Tenor, provided Blair with a copy of the proposal that Tenor had previously made to Oxygen in March 2011. (Id. ¶ 21.) On or about June 15, 2011, Blair informed Khatri that Oxygen had received an offer of terms Oxygen preferred to those proffered by Tenor. Blair described the offer generally and told Tenor that it was fully subscribed. (Id. ¶ 22.)

On June 16, 2011, FGP and Oxygen agreed to a transaction pursuant to which FGP placed $4.6 million of convertible debt (and associated warrants) on behalf of Oxygen. (Pls. 56.1 ¶ 27.) On June 22, 2011, Khatri sent an email to Oxygen stating that he had just seen a press release stating that Oxygen had entered into an agreement to raise $4.6 million in financing through the issuance of convertible notes and warrants; Khatri stated that Tenor had a right of participation and had not received any notice from Oxygen with respect to the financing as required by Section 16 of the Subscription Agreement. (Id. ¶ 32.)

On June 23, 2011, Oxygen received permission from NASDAQ to increase the size of the offering to $9.2 million. (Decl. of Michael Jebsen ("Jebsen Decl.") (Dkt. No. 33) ¶ 3.) Oxygen then gave Tenor notice that it had non-public information that it was willing to share with them; Tenor agreed to receive the information. (Id. ¶ 4.) Tenor was given the opportunity--along with another investor, Empery--to participate in the new tranche of $4.6 million that had been added to the original offering. (Id.) Empery agreed to participate in the amount of $300,000, although Tenor did not. (Id. ¶ 5.) At his deposition in connection with this matter, Khatri explained, "We don't know what would have happened to the stock price had a $9.2 million transaction been announced. It could have been highly damaging

to the company, the stock could have opened down 30 to 40 percent. We just don't know." (Khatri Dep. at 249 (Khurana Decl. Ex. B).) He testified that he was unsure whether the bigger transaction would have been profitable, and that he was more certain that he would have made a profit on the smaller, first transaction. (Id. at 251.) When asked at his deposition whether he was certain that he would have made a profit had he invested in the $4.6 million deal on June 22, 2011, he stated "I'm certain." (Id. at 252.)

Similarly David Kay of Tenor testified that the "rights to participate in future funding" is a critical market term in these type of financing arrangements, particularly because it allows Tenor to protect its own interests. (Kay Dep. at 79-80 (Khurana Decl. Ex. A).) Kay explained,

> If the company is going to go out and do something
> additional, they need to show you, because there's an
> infinite number of terms that they can do, and if it's
> either attractive or it's going to harm you if you
> don't do it, you have the right to go and protect
> you[rself].

(Id. at 81.) When Kay was asked why Tenor did not participate in the subsequent $9.2 million transaction he testified that it could have been unsustainable for the company:

> I think they would have diluted 35 percent of their
> equity in one day with huge interest rates for a
> company that is not having cash flow . . . [it] would
> have been a money losing exercise for us, whereas if
> we had had the opportunity to participate in the

initial deal, it would have been a totally different
deal, obviously.

(Id. at 104.)   When Christian Stern, Oxygen's Chief Executive
Officer during the time period relevant to this action, was
asked at his deposition whether Oxygen considered Tenor's
participation rights in connection with the June 16 financing
arrangement, he testified "Nobody did. And it was just too
hectic, we forgot."  (Dep. of Christian Stern ("Stern Dep.") at
118 (Dunn Decl. Ex. C).)

Khatri's job responsibilities required him to model the
value of transactions.  (See Khatri Dep. at 255 ("I do it quite
frequently.").)  On June 22, 2011, Khatri used the Black-Sholes
model to calculate the value of the lost opportunity presented
by the transaction; he calculated that Tenor lost $1.96 per
warrant with exercise price $2.85, lost $2.11 per warrant with
the exercise price of $2.15, and lost $2.01 per warrant at an
exercise price of $2.60.  (Id. at 246-47.)  He also testified
that he could have insured that Tenor maintained the value it
could have achieved in the transaction by hedging it.  (Id. at
248.)[3]

In certain of its SEC filings, Oxygen estimated the total
value of the warrants issued in connection with the June 16,
2011 transaction as $1,960,497; and the "beneficial conversion

---

[3] Khatri's calculations were provided to defendant during discovery.  (Khurana
Decl. Ex. E.)

features related to the notes were determined to be approximately $2,939,504." (Dunn Decl. Ex. O.) Oxygen reported that the aggregate "discount on the notes totaled $4.9 million and is being amortized over [the three-year] term of the notes." (Id.)

## II.  DISCUSSION

### A.   Legal Standard

Summary judgment is warranted if the pleadings, the discovery and disclosure materials, along with any admissible affidavits or declarations, demonstrate that there is no genuine issue of fact necessitating resolution at trial. Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).  A party moving for summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists; all reasonable inferences should be drawn in favor of the non-moving party.  See Anderson, 477 U.S. at 255; Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997).  The burden then shifts to the non-moving party to come forward with "admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhauser Co., 536 F.3d 140, 145 (2d Cir. 2008).  Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the moving party satisfies its burden on the

motion by pointing to an absence of evidence to support an essential element of the non-movant's claim. See Libraire v. Kaplan, No. 06 Civ. 1500, 2008 WL 794973, at *5 (E.D.N.Y. Mar. 24, 2008).

Where it is clear that no rational trier of fact could find in favor of the non-moving party, summary judgment is warranted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994). The mere possibility that a dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." Anderson, 477 U.S. at 247-48. Mere speculation or conjecture is insufficient to defeat a motion. W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).

B. Applicable Principles of Contract Law

Under New York law, an action for breach of contract requires (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994). Damages are an essential element of a breach of contract claim. See National Market Share, Inc. v. Sterling Nat. Bank, 392 F. 3d 520, 525 (2d Cir. 2004); see also LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey, 173 F.3d 454, 465 (2d Cir. 1999) ("Under New York law . . . '[t]he

failure to prove damages is . . . fatal to [a] plaintiff's breach of contract cause of action." (quotation marks omitted)). In other words, without proving some amount of damages, a plaintiff cannot prevail on the liability aspect of a breach of contract claim.  See LNC Invs., Inc., 173 F.3d at 465.  So long as it is clear that the plaintiff has sustained some damages, however, summary judgment may be granted on the remainder of a contract claim with a damages determination to await trial. See, e.g., U.S. Bank Nat'l Ass'n v. Southwest Airlines Co., No. 07 Civ. 11131(DLC), 2009 WL 2163594, at *12 (S.D.N.Y. July 20, 2009); Citicorp Leasing, Inc. v. Kusher Family Ltd. P'Ship, No. 05 Civ. 9163, 2006 WL 1982757, at *8 (S.D.N.Y. July 14, 2006) (finding that the defendants were liable to the plaintiff but that "[t]riable issues of fact as to the calculation of various damages components still remain, and this must be decided at trial").

Parties can enter into contracts pursuant to which they specifically agree to substitute performance under one contract for performance under another--i.e., a type of accord and satisfaction.  See Yahaya v. Hua, No. 87 Civ. 7309, 1989 WL 214481, at *4 (S.D.N.Y. Nov. 28, 1989); S. Leo Harmonay, Inc. v. Binks Mfg. Co., 597 F.Supp. 1014, 1028 (S.D.N.Y. 1984).  In order to establish that performance for an original obligation has been substituted by alternative performance, there must be a

willing and knowing acceptance by the otherwise injured party--
i.e., the party must understand and accept that it is agreeing
to substitute one form of performance for another.  See United
States v. Chilstead Bldg Co., Inc., 18 F. Supp. 2d 210, 213
(N.D.N.Y. 1998).

    C.    Breach of Contract

    There is no dispute as to whether the parties herein
entered into a binding agreement in May 2010, which contained a
provision for "Participation in Future Financing" (Section 16 of
the Agreement).  There is also no dispute that Tenor fulfilled
its obligations under the Agreement.  The sole issue with regard
to Tenor's motion for partial summary judgment is whether there
is a triable issue of fact as to whether defendant breached the
provisions of Section 16 of the Agreement.  The Court finds that
there is not.

    The admission of Oxygen's then-CEO, Stern, that Oxygen
"forgot" about Tenor's participation rights is itself a strong,
standalone piece of evidence on this issue.  But, there is far
more than that.  There is no dispute that Section 16 requires
that Oxygen provide Tenor with an Offer Notice.  That never
happened.  On its face, the presentation that Blair made to
Tenor stated that it was not an offer; and there is no evidence
in the record of any other "notice" being provided.  Oxygen
argues that this presentation in fact fulfilled its duties in

12

this regard, but that ignores the plain language appearing on page 1 of the document.

In addition, the Blair presentation simply contains vague statements about a potential transaction--it contains none of the specific information clearly contemplated in Section 16 relating the price and terms upon which the securities are to be issued, sold, or exchanged.  This language plainly contemplates that Tenor would be placed on specific notice as to the terms of a transaction and would have the ability to make an informed choice about whether it wanted to participate or not.  A "range" of possible transaction options and a 100 percent swing in possible transaction value ("between $5-10 million") does not fulfill these requirements.

That is additionally demonstrated by the fact that Section 16 specifically provides that in the event the terms or conditions of the transaction change, then Oxygen would have had to provide a new Offer Notice and an additional and longer Offer Period.  (See Dunn Decl. Ex. A at OBT 0206-000000142-43.) Moreover, the presentation contains no pricing--but instead a pricing date; and no conditions that might impact that price in any myriad of ways.  The presentation simply does not constitute the Offer Notice contemplated in Section 16.  In the absence of an Offer Notice, there is no triable issue as to whether Oxygen breached the Agreement.

Oxygen has urged that even if it breached the Agreement, its non-performance should be excused for any one of the following reasons: (1) the parties agreed to a substitute performance of the Offer Notice in the form of the Blair presentation; (2) Tenor should be equitably estopped from asserting a breach of contract claim as to Section 16 since it should have understood from the Blair presentation that a transaction was imminent but yet it waited until the public announcement to complain; (3) that Tenor failed to mitigate by not agreeing as of June 23 to participate in the larger $9.6 million transaction; and (4) it was impossible for Oxygen to perform.  None of those arguments raises a triable issue of fact as to whether or not Oxygen breached its contract.

First, Oxygen's argument regarding substitute performance fails because there are no facts in the record that suggest that Tenor willingly and knowingly accepted the Blair presentation as a substitute for the Offer Notice.  As set forth above, the presentation self-described itself as "not" an offer, so there was nothing for Tenor to have accepted as substitute performance in connection therewith.  See Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 261-62 (2d Cir. 1984).

In addition, however, by the time that the transaction was agreed with the third party on June 16, 2011 and announced on June 22, 2011, there were a number of conditions and terms added

14

to the deal that made it far more specific than the very general
presentation made by Blair to Tenor.  Such new terms would have
triggered a new contractual obligation for a new Offer Notice
and a ten day acceptance period.  The alleged "substitute
performance" of the Blair presentation could not--and did not--
purport to cover all of the various requirements contained in
Section 16.

Second, Oxygen uses the same Blair presentation to form the
basis of its defense of equitable estoppel.  That concept is
also not applicable to the chronology of facts here at issue.
Estoppel by acquiescence requires that Oxygen at least raise a
triable issue as to whether Tenor had actual or constructive
knowledge of Oxygen's breach and that Tenor intended Oxygen to
rely on its silence.  See Mattis v. Zheng, 05 Civ. 2924, 2006 WL
3155843, at *5 (S.D.N.Y. Oct. 27, 2006).  The only facts to
which Oxygen points in support of this theory is that Blair made
a presentation and there was a communication from Tenor
following that presentation in which Tenor presented its own
terms for additional financing.  Not a single fact suggests that
Tenor expected that Oxygen would rely on its silence with
respect to a presentation that was not in fact an offer.

Moreover, it is undisputed that Oxygen's CEO testified that
Oxygen simply "forgot" to take Tenor's participation rights into
consideration--that eliminates any reliance that they could

assert--clearly they were not relying on any actions by Tenor when Tenor's rights were not recollected.   In addition, of course, is the fact that there are no acts by Tenor relating to the Blair presentation which could otherwise form the basis for reasonable reliance.

Third, Oxygen's arguments regarding mitigation are also unavailing.   According to Oxygen, the fact that it immediately offered Tenor the opportunity to participate in a much larger financing opportunity on June 23 (the $9.2 million financing) provided Tenor with a chance fully to mitigate any harm suffered by virtue of its exclusion from the $4.3 million financing announced the day before.   Tenor argues that all of the discussions regarding the June 23 financing are inadmissible as settlement discussions under Fed. R. Evid. 408 and, in any event, based upon hearsay.   Those arguments are both correct.

Even if they weren't, there is a more significant problem with Oxygen's mitigation argument:   the evidence (e.g., testimony from Tenor's Khatri and Kay) demonstrate that the differently-sized offerings were not equivalent--i.e., the larger offering carried more risk and uncertainty.   Khatri testified that he was uncertain as to whether the larger offering would even be profitable--indeed, it could have had a negative impact on the share price--while the smaller offering announced on June 22 he was "certain" would be profitable.

Thus, there is no evidence before this Court that raises a triable issue that Tenor failed to mitigate.[4]

Finally, Oxygen's argument regarding "impossibility" of performance is a hail-Mary pass that falls short of the end zone. The doctrine of "impossibility" is entirely inapplicable. A party seeking to excuse contractual performance on that basis must demonstrate that (1) the event made the performance impracticable; (2) the non-occurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not assumed a greater obligation than the law imposes. See Restatement (Second) of Contracts § 261 (1981); see also Edge Group WAICCA LLC v. Sapir Group LLC, 705 F. Supp. 2d 304, 318-19 (S.D.N.Y. 2010). Oxygen does not argue that it considered Tenor's participation rights in the deal, but simply was unable to comply with those rights: rather, Oxygen readily admitted (through its then-CEO) that Oxygen simply "forgot" about Tenor's participation rights. That is not what the law of impossibility contemplates.

In addition, Oxygen's argument of impossibility is again based on the Blair presentation--and that somehow (despite its own CEO's statement to the contrary) it thought that this was

---

[4] Of course, in any event, mitigation would go to the issue of recoverable damages.

17

enough to satisfy its contractual obligations until it was too late.  That is not "impossibility" as understood in contract law; that is, at best, an erroneous assumption that a presentation self-described as a "non-offer" or solicitation could transform itself into an offer.  Oxygen also argues that at the time that it entered the May 2010 Subscription Agreement that contained Section 16, it did not understand that it would be required to provide an advance level of detail that Tenor then claimed it must provide.  That, however, ignores both the CEO statement that it "forgot" and not that it was simply doing the best that it could, and that what it is relying on as the Offer Notice for a level of detail was explicitly not an offer. There are no facts in the record that suggest that Oxygen could not have sent Tenor an Offer Notice on June 15 and given it the required 24 hours consideration period.  Oxygen's defense of impossibility cannot create a triable issue.

Accordingly, Tenor has met its burden of proving an enforceable contract under which it performed that was breached by Oxygen.

D.  <u>Damages</u>

Defendant Oxygen argues that summary judgment should be granted in its favor because Tenor is unable to raise a triable issue with respect to the essential element of damages.  As

discussed below, on the record before the Court, the Court finds that Tenor has sustained its burden of proving some damages.

Oxygen argues that the evidence Tenor produced during discovery consisted simply of Khatri's Black-Sholes calculations--and now belatedly Tenor is arguing that it will accept as damages simply the valuations of the June 22 deal set forth in its own SEC filings.  According to Oxygen, the former is insufficient and the latter is both belated and insufficient.

As an initial matter, this Court need not reach the question of whether the assertion of damages based on calculations in Oxygen's SEC filings (as well as the proposed declaration from plaintiff's purported expert, Ellis L. Levin) are admissible for purposes of determining this motion.  Indeed, the Court did not need to--and in fact did not--consider either in making its determination on whether there existed a triable issue of fact on damages.  The admissibility of Oxygen's SEC filings as well as the presentation of Mr. Levin as an expert can be the subject of an _in_ _limine_ motion at the appropriate time.

A triable issue of fact on damages, precluding summary judgment, is raised by Khatri's testimony alone.  At his deposition, Khatri stated that he was "certain" that he would have made a profit on the June 22 deal.  He also set forth--by warrant price--the amount of loss he calculated that Tenor

experienced.  (See Khatri Dep. at 246-47.)[5]  His calculations
were based on his use of the Black-Sholes calculator which he
stated he used as part of his job responsibilities in connection
with evaluating Tenor's loss on the June 22 transaction.  (Id.
at 230.)  Khatri's testimony is that of a fact witness, and it
is sufficient to raise a triable issue of fact as to damages,
even in the face of an expert declaration from Oxygen stating
that Tenor did not sustain any damages.

Oxygen argues that Khatri's damages calculations--and the
formulas through which those calculations were derived--are
inadmissible because Tenor failed to disclose them as part of
their Rule 26 disclosures.  "The purpose of [Rule 26
disclosures] is to prevent the practice of 'sandbagging' an
opposing party with new evidence."  Ebewo v. Martinez, 209 F.
Supp. 2d 600, 607 (S.D.N.Y. 2004).  To the extent that Khatri's
calculations were not included in the Rule 26 disclosures, they
were disclosed at his March 14, 2012 deposition--i.e., almost a
full two months prior to summary judgment motions were made.
There is certainly no way that those calculations "sandbagged"
Oxygen in being able to prepare for trial--or sufficiently rebut
them at some point during the pendency of this action.[6]

---

[5] That testimony also undercuts Oxygen's argument that Tenor's damages
calculations are speculative and therefore inadmissible.

[6] The issue of "sandbagging" is equally pertinent to the question of Tenor's
use of Oxygen's SEC filings and the presentation of Mr. Levin as a purported

Accordingly, the Court does not find that those calculations should be precluded simply because they were not disclosed with distinct particularity in Tenor's Rule 26 disclosures.  The Court finds the Khatri testimony sufficient to show that Tenor sustained some damages such that they are able to sustain their breach of contract claim.

The Court expects that Oxygen can--and will--use Khatri's Black-Sholes calculations and any lack of precision it perceives in those calculations on cross-examination at a trial on the precise question of damages.  However, for purposes of surviving a motion for summary judgment as to "lack of damage", Oxygen's motion must fail.  Based on the work performed by a Tenor employee tasked with that responsibility, Tenor asserts it was damaged.

CONCLUSION

For all of the reasons set forth above, Tenor's motion for summary judgment is GRANTED and defendant Oxygen's motion for summary judgment is DENIED.

Accordingly, summary judgment is granted for Tenor on the question of Oxygen's liability for breach of contract.  Because

---

expert for plaintiffs.  Oxygen is now on notice of Tenor's damage theory based upon the SEC filings as well as the possibility that Tenor will present Mr. Levin as an expert at trial.  In order to prevent any alleged "sandbagging," Tenor must make Mr. Levin available for deposition prior to trial.  Thus, the purpose for which Rule 26 was designed shall not be foiled by any of Tenor's damages theories--or the evidence on which those theories are predicated.

Tenor raised a triable issue of fact as to the <u>amount</u> of damages it sustained--<u>i.e.</u>, proved that it did sustain some damages sufficient to meet the fourth element of a breach of contract action--the question of damages must be presented to a jury for final determination.

The Court ORDERS that plaintiff must produce Mr. Levin, their proposed expert on damages, for a one-day deposition at any time prior to trial.  Failure to do so will result in preclusion of Mr. Levin appearing at trial.

The July 25, 2012 final pretrial conference and the July 30, 2012 trial dates are adjourned.

A trial on damages will be held on September 10, 2012.  The parties are to appear at a final pretrial conference on August 30, 2012 at 1:30 p.m.

All joint pretrial materials are due by August 28, 2012 at 5:00 p.m.  They are to be delivered to the Court no later than that date and time as well.

The Clerk of the Court shall terminate the motions at Docket Nos. 28 and 31.

SO ORDERED:

Dated:    New York, New York
          July 11, 2012


                            _____
                            KATHERINE B. FORREST
                            United States District Judge